DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DELSIA BRYAN-WILSON, MARVIN WILSON,**
and **DELSIA GRANT,**
Appellants,

v.

**UNIVERSAL PROPERTY & CASUALTY INSURANCE COMPANY,**
Appellee.

No. 4D2024-1547

[December 17, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. CACE-20-010756.

Mark A. Nation and Paul W. Pritchard of The Nation Law Firm, Longwood, for appellants.

Kara Rockenbach Link and David A. Noel of Link & Rockenbach, PA, West Palm Beach, for appellee.

GERBER, J.

After a jury found the homeowners had failed to provide prompt notice of a loss event, and that such failure had prejudiced the insurer's claim investigation, the circuit court entered final judgment in the insurer's favor. On appeal, the homeowners primarily argue the insurer failed to present any evidence proving the lack of prompt notice had prejudiced the insurer's claim investigation, and thus the circuit court erred in denying the homeowners' directed verdict motion on that affirmative defense. We agree with the homeowners' primary argument, and thus reverse and remand for a new trial on the homeowners' claimed loss amount.

We present this opinion in four sections:
1. the policy, the loss event, and the claim;
2. the pre-trial litigation;
3. the trial; and
4. our review.

# 1. *The Policy, the Loss Event, and the Claim*

The following facts are undisputed. The homeowners purchased an insurance policy from the insurer to cover their home. The policy included the following "Duties After Loss" clause:

> In case of a loss to covered property, we have no duty to provide coverage under this policy *if the [homeowners'] failure to comply with the following duties is prejudicial to us*. These duties [include]:
>
> 1. *Give prompt notice to us or our agent*; . . . .

(emphases added).

On September 1, 2019, while the policy was in effect, the homeowners' toilets and bathtub overflowed, causing damages throughout the home. The homeowners did not immediately notify the insurer of the loss, take any damage photos or videos, or hire anyone to repair or mitigate the loss. Instead, a few weeks after the loss event, the homeowners contacted an attorney. The attorney, in turn, hired an investigator who, on October 14, 2019, photographed the homeowners' damaged property.

On October 29, 2019, fifty-eight days after the loss event, the homeowners filed a damages claim with the insurer. Three days later, on November 1, 2019, the insurer's field adjuster inspected the property. After concluding the inspection, the field adjuster tendered the insurer's $9,286.43 check to the homeowners.

Three days later, on November 4, 2019, the insurer sent the homeowners a written coverage determination letter. The letter identified the "Date of Loss" as "9/1/2019," the "First Notice of Loss" as "10/29/2019," and stated: "We have completed our review of your claim." The letter also indicated the insurer had accepted coverage, valued the damage at $13,972.64, and, after applying the applicable deductible and recoverable depreciation, determined the total payment amount to be $9,286.43. The letter further stated: "[The insurer] reserves all rights under the policy provisions to raise additional coverage defenses as [those defenses] become known to us in the future." Attached to the letter was the field adjuster's line-item estimate calculating the $13,972.64 in damages. The estimate did not include any costs which would be necessary to tear out portions of the property to determine the loss event's cause and then replace those torn-out portions of the property.

## 2. *The Pre-Trial Litigation*

In July 2020, ten months after the loss event, the homeowners sued the insurer for breach of contract. The homeowners alleged the insurer was unwilling to cover the costs which would be necessary to tear out portions of the property to determine the loss event's cause and then replace those torn-out portions of the property. The homeowners further alleged the estimated tear-out and replacement costs totaled $77,363.98.

The insurer's answer raised several affirmative defenses, including that the homeowners had failed to provide prompt notice of the loss as required under the policy's "Duties After Loss" clause, and that such failure had allegedly prejudiced the insurer's claim investigation. The insurer also alleged the homeowners' costs estimate was excessive.

During discovery, the homeowners deposed the insurer's first-designated corporate representative. The first-designated corporate representative conceded the insurer's field inspector had not attempted to determine the loss event's cause, or perform any plumbing tests or moisture readings, before tendering the insurer's $9,286.43 check to the homeowners. When the homeowners' counsel asked the first-designated corporate representative whether the insurer had been prejudiced in its claim investigation, the first-designated corporate representative's answer apparently surprised the homeowners' counsel:

> Q. Is it [the insurer's] position that it was prejudiced in the investigation of this claim?
>
> A. *I don't know.*
>
> Q. What was that?
>
> A. *I don't know.*
>
> Q. Okay. So as the designated corporate representative on behalf of [the insurer], you are unaware of whether or not [the insurer's] position is it was prejudiced in the investigation of this claim?
>
> A. Yeah. I don't know if [the investigation] was prejudiced or not. We came out to do the inspection and also an issue about payment, so.
>
> ....

Q. ... Did [the insurer] ever request to inspect the property but was not allowed to inspect by [the homeowners] or any of [their] representatives?

A. Not what the file reflects. ... [T]he field adjuster was able to come out to the inspection.

Q. Understood. And then [the insurer] never requested a second inspection, correct?

A. Not what the file reflects, no.

Q. And [the insurer] was able to render a coverage determination, right?

....

A. Based off the field adjuster coming out to inspect it and then issue payment.

(emphases added).

When the homeowners' counsel then asked what facts supported the insurer's affirmative defense that the homeowners' lack of prompt notice had allegedly prejudiced the insurer's claim investigation, the first-designated corporate representative responded: "In the policy, it basically states that insured needs to promptly notify the insurance regarding damages to the property and the insured basically reported the claim within like 58 days." However, the first-designated corporate representative did not testify how, if at all, the 58-day delay had allegedly prejudiced the insurer's claim investigation.

### 3. *The Trial*

At trial, the parties agreed the homeowners' policy covered any costs which would be necessary to tear out portions of the property to determine the loss event's cause and then replace those torn-out portions of the property. However, the parties disagreed as to whether the homeowners' lack of prompt notice had prejudiced the insurer's claim investigation, and the amount of tear-out and replacement costs.

4

a.  *The Homeowners' Witnesses*

The homeowners presented testimony from three witnesses:  (1) the homeowner wife; (2) a plumber; and (3) a general contractor.

The homeowner wife testified that, sometime before November 2018, water started backing up from the drain behind their washing machine. The homeowners hired a handyman who rerouted the plumbing system, which stopped the leak.  Soon thereafter, water started backing up and leaking under the kitchen sink.  Rather than have further repairs performed, the homeowners cleaned up the water as that leak occurred.

The homeowner wife further testified that ten months later, on September 1, 2019, water started overflowing from their master bathroom toilet and bathtub.  That was the first time the homeowners had a plumbing issue occur in their master bathroom.  The homeowners did not notify the insurer on the loss event date because they did not know if they could file an insurance claim, and feared the insurer would drop their coverage or raise their premiums.  Instead, the homeowners contacted an attorney, who filed their October 29, 2019, claim for that loss.

The homeowner wife further testified that when the insurer's field adjuster had inspected the property, she gave the field adjuster unrestricted access to the property, and answered all of the field adjuster's questions.  The insurer did not request any further information or send anyone else to further inspect the property.

The plumber testified he had reviewed four years of videos showing the plumbing's interior.  The plumber opined the plumbing's drainage system had failed and caused the overflows in the master bathroom in September 2019.  The plumber testified the first draining system failure likely had been the pipe connecting the kitchen and laundry room in November 2018, which had resulted in the leaks in those locations at that time.  The plumber further opined that to access and repair the drainage system, the homeowners would need to tear out and replace portions of the property.

The general contractor testified as to the estimated costs to tear out and replace the torn-out property.

b.  *The Insurer's Witnesses*

The insurer presented testimony from two witnesses:  (1) a plumber; and (2) a second-designated corporate representative.

The insurer's plumber testified the insurer had hired him in October 2023—four years after the loss event—to inspect the property's plumbing system. The insurer's plumber opined the overflows were caused by a "back-pitch" in the sewer line located underneath the home's bathrooms. The plumber testified the sewer line would need to be replaced, which would entail removing the foundation and trenching the hallway bathroom's floor. The plumber opined the cost to access the back-pitched sewer line would be $5,500, which did not include the cost of returning the property to its pre-loss condition.

The insurer then sought to have a new, second-designated corporate representative testify regarding the insurer's affirmative defense that the homeowners' lack of prompt notice had allegedly prejudiced the insurer's claim investigation. The homeowners' counsel objected that the insurer was bound by the testimony of its first-designated corporate representative, who did not know how the insurer's claim investigation had been prejudiced. The insurer's counsel responded that its first-designated corporate representative's testimony had occurred early in discovery, and the insurer's second-designated corporate representative was in a better position to testify as to how the insurer's claim investigation had been prejudiced.

The circuit court asked the insurer's counsel to proffer the testimony to which the second-designated corporate representative would testify. According to the insurer's counsel, the second-designated corporate representative would testify that during the 58-day delay between when the loss event had occurred and the insurer's field adjuster's inspection, the property's condition *could have* changed, thus prejudicing the insurer's claim investigation. The circuit court asked whether such testimony would be speculative, and whether the insurer had any evidence that the property's condition had changed during the 58-day delay. The insurer's counsel responded, "We don't[.]" The circuit court overruled the homeowners' objection.

After the circuit court overruled the homeowners' objection, the following direct examination occurred between the insurer's counsel and its second-designated corporate representative:

> Q. Okay. Is it fair to say that this claim was reported to [the insurer] 58 days after the alleged loss?
>
> A. Yes. We were told the date of loss was September 1, 2019, and we ... weren't told about it until October 29, 2019.

Q. ... [H]ow was ... [the insurer] prejudiced by that late reporting?

....

A. Because during those 58 days that we weren't told of the loss, [the homeowner wife] had someone out there at the property, taking photos of the property as of October 14, 2019, and we have no idea ... what else happened within that time span of those 58 days, which prejudiced our investigation because we're not aware if the damages we're seeing at the time that we're out there are actually in fact from what she's saying happened on September 1st.

c. *The Directed Verdict Motions on the Insurer's Prejudice Defense*

After the insurer rested, the homeowners moved for a directed verdict on the insurer's affirmative defense that the homeowners' lack of prompt notice of the September 1, 2019, loss event had allegedly prejudiced the insurer's claim investigation. The homeowners argued no reasonable jury could find the insurer had been prejudiced, based on the insurer having investigated the claim, determined a direct physical loss had occurred during the policy period, and paid the claim. The circuit court deferred ruling on the homeowners' motion.

Immediately thereafter, the insurer also moved for a directed verdict on the same affirmative defense. The insurer relied on its second-designated corporate representative's testimony that the insurer's claim investigation had been prejudiced due to the 58-day delay between the September 1, 2019, loss event and the homeowners' claim on October 29, 2019. The circuit court denied the insurer's motion.

d. *Jury Instructions and Closing Arguments*

Before closing arguments, the circuit court read the jury the following stipulated instruction on the insurer's prejudice defense:

According to [the insurer], [the homeowners'] claim was untimely because the September 1st, 2019, claim was not reported until October 29th, 2019.

The homeowners' closing argument reiterated this jury instruction:

According to [the insurer], the [homeowners'] claim was untimely because the September 2019 claim, *not the 2018 issue*, was not reported until 10-29-19.

[The September 2019 claim is] the claim [which the insurer's defense] is talking about. That is the claim that this defense is focused on.

(emphases added).

The insurer did not object to this argument. In fact, the insurer's closing also relied on the September 1, 2019, loss event date in arguing how the 58-day delay in reporting that loss event had allegedly prejudiced the insurer's claim investigation:

Think about those 58 days, what happened. [The homeowner wife] didn't call any remediation company, no plumber. She called [her counsel's investigator], and then [the insurer] was called about 15 days after that.

....

58 days, 58 days after not documenting what happened, not showing [the insurer] a plumbing report, calling out [the investigator]. Just like she called [the investigator], she could have called [the insurer]. 58 days, but yet [the homeowner wife] sits here on the stand before you and say[s] [the insurer] wasn't prejudiced because [the insurer] made a payment of $9,200 on November 1st.

### e. *The Jury Verdict and the Homeowners' Post-Trial Motions*

The jury ultimately found for the insurer on the insurer's affirmative defense that the homeowners' 58-day delay in reporting the September 1, 2019, loss event had prejudiced the insurer's claim investigation.

Following the verdict, the homeowners filed a motion renewing their directed verdict motion and seeking to set aside the verdict and receive a new trial.

The insurer's response argued the homeowners' post-trial motion "must be denied because there was ample evidence from which the jury could reasonably find that [the homeowners'] 58-day delay in reporting the loss

was not prompt notice, and prejudiced [the insurer's] investigation of the loss."

The circuit court entered a written order summarily denying the homeowners' post-trial motion. Thereafter, consistent with the jury's verdict, the circuit court entered final judgment for the insurer. The homeowners then appealed.

### 4. *Our Review*

The homeowners summarize their primary argument—seeking reversal of the circuit court's denial of their directed verdict motion—as follows:

> [The insurer] was not prejudiced as a matter of law—it investigated the claim, concluded its investigation, came to a coverage determination, and stipulated that the water damage it paid for was that water damage which [the homeowners] reported on October 29. [The insurer] was not prejudiced for the Tear Out coverage claim because [the insurer] never tried to investigate the cause of loss and need for Tear Out, and the passage of 58 days did not prevent [the insurer] from determining the cause of loss or the damages attributable to it. ...
>
> ....
>
> The only potential prejudice from the delay in notice was a speculative increase in the water damage which *was not* an issue or disputed[;] it was stipulated and agreed there was direct physical loss during the policy period, and the amount [the insurer] paid for was that water damage that [the homeowners] claimed on September 1, 2019 and reported on October 29, 2019. A speculative increase in the [s]tipulated [w]ater [d]amage is not prejudice regarding the issues before the jury ....

The insurer summarizes its response, in pertinent part, as follows:

> By reporting their claim late, [the homeowners] deprived [the insurer] of the opportunity to see the damage as it existed ... on September 1, 2019, immediately after the alleged backups and leaks. This in turn hindered [the insurer's] investigation into whether [the homeowners'] damage was caused by the September 1, 2019, backup, or by the prior

9

2018 backups or the ongoing kitchen leak. [The homeowners'] late notice deprived [the insurer] of the opportunity to evaluate and assert potential coverage defenses like the repeated seepage exclusion.

"The standard of review on appeal of [a] trial court's ruling on a motion for directed verdict is *de novo*." *People's Tr. Ins. Co. v. Kidwell Grp., LLC*, 363 So. 3d 1108, 1110 (Fla. 4th DCA 2023) (citations omitted). "A motion for directed verdict should not be granted unless the trial court, after viewing the evidence in the light most favorable to the non-moving party, determines that no reasonable jury could render a verdict for the non-moving party." *Id.* (citation omitted).

The "failure to comply with policy conditions requires prejudice to [the] insurer in order for that failure to constitute a material breach and permit an insurer to deny coverage for a claim." *Arguello v. People's Tr. Ins. Co.*, 315 So. 3d 35, 41–42 (Fla. 4th DCA 2021). Consistent with the jury instructions given in this case, prejudice in the context of late notice generally means the insurer was deprived of the opportunity to investigate the facts of the claim and determine the cause and extent of the damage. *See You Restorations LLC v. First Protective Ins. Co.*, 417 So. 3d 358, 367 (Fla. 4th DCA 2025) ("The insurer can be prejudiced by the lack of timely notice in its ability to investigate the facts and determine the cause of the damage and thus whether the loss is covered. The delay may also prevent the insurer from evaluating the extent of the damages. If the delay has added to the repair cost, the insurer has been prejudiced.") (internal citations omitted).

In *Perez v. Citizens Property Insurance Corp.*, 345 So. 3d 893 (Fla. 4th DCA 2022), which involved policy language identical to the policy language here—"we have no duty to provide coverage under this policy if the [homeowners'] failure to comply with the following duties is prejudicial to us"—we held such "policy language places the burden on the insurer to prove prejudice." *Id.* at 896. *But see Arce v. Citizens Prop. Ins. Corp.*, 388 So. 3d 205, 206 (Fla. 3d DCA 2024) (certifying conflict with *Perez*'s holding that the aforementioned policy language places the initial burden on the insurer to prove prejudice).

Here, the insurer did not meet its burden of proof on its affirmative defense that the homeowners' 58-day delay in reporting the September 1, 2019, loss event had allegedly prejudiced the insurer's claim investigation.

As the insurer's first-designated corporate representative's testimony established, the loss event had occurred on September 1, 2019, and the

10

homeowners reported the loss event to the insurer on October 29, 2019. The insurer's field adjuster inspected the property three days later, was able to determine the property had sustained direct physical loss caused by a water backup during the policy period, and issued payment consistent with the field adjuster's estimate.

As the homeowner wife's unrebutted testimony established, the insurer's adjuster had full, unrestricted access to the property during his inspection, and all of his questions were answered. The field adjuster did not request any documentation from the homeowners during the inspection, and the insurer did not send a plumber to the property following the inspection. Instead, three days after the inspection, the insurer sent the homeowners a coverage determination letter listing the "Date of Loss" as "9/1/2019" and the "First Notice of Loss" as "10/29/2019," and advising that it had "completed our review of your claim." In other words, the insurer—despite knowing the homeowners had not filed their claim until fifty-eight days after the loss event—was still able to investigate the claim to its apparent satisfaction and determine coverage. As the homeowners correctly argue: "It is incompatible to then find [the insurer] was deprived of the opportunity to investigate."

The insurer's prejudice claim at trial was based on mere speculation. When the insurer's second-designated corporate representative was asked how the homeowners' 58-day delay in reporting the September 1, 2019, loss event had prejudiced the insurer's claim investigation, she answered:

> Because during those 58 days that we weren't told of the loss, [the homeowner wife] had someone out there at the property, taking photos of the property as of October 14, 2019, and we have no idea … what else happened within that time span of those 58 days, which prejudiced our investigation because we're not aware if the damages we're seeing at the time that we're out there are actually in fact from what she's saying happened on September 1st.

Stated differently, the insurer alleged it was prejudiced because it had "no idea what happened" during those fifty-eight days, and therefore the property's condition could have changed between the loss event date and the field adjuster's inspection. However, the insurer presented no evidence indicating the property's condition may have changed during those fifty-eight days. As revealed during the discussion on the homeowners' objection to the insurer's second-designated corporate representative's testimony, when the circuit court asked if the insurer had any evidence that the property's condition had changed during the 58-day delay, the

11

insurer's counsel responded: "We don't." As such, the insurer's second-designated corporate representative's testimony was insufficient to establish any prejudice as a matter of law. *See Tiedtke v. Fid. & Cas. Co. of N.Y.*, 222 So. 2d 206, 209 (Fla. 1969) ("Mere speculation that prejudice may exist will not suffice when lack of prejudice is clearly demonstrated."); *Hartford Accident & Indem. Co. v. Phelps*, 294 So. 2d 362, 365 (Fla. 1st DCA 1974) ("Where lack of prejudice is demonstrated, mere speculation that prejudice may exist as a result of late notice will not suffice to relieve an insurer of its liability.").

### *Conclusion*

Based on the foregoing, we reverse the circuit court's final judgment for the insurer. We remand for the circuit court to grant the homeowners' directed verdict motion on the insurer's affirmative defense, and conduct a new trial on the sole factual issue of the homeowners' claimed loss amount. Our decision moots the homeowners' other arguments on appeal.

*Reversed and remanded with instructions.*

MAY and CONNER, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**